**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, WESTERN DIVISION**

| | |
|---|---|
| DAWN SHEARROW and DEL SHEARROW, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ROCKFORD PARK DISTRICT, a municipal corporation of the state of Illinois; TIM DIMKE, JESSICA STEINBERG, JAY SANDINE, ZACK McINTYRE, DEBBIE GASS, TYLER SMITH, IAN LINNABARY, DOUGLAS BROOKS, JACK ARMSTRONG, and NATE MARTIN, each in his or her individual capacities, | ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs, Dawn and Del Shearrow, by and through their attorney, Bradford A. LeHew, for their complaint against Defendants, state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over Dawn Shearrow's claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

2.      This Court has supplemental jurisdiction over Del Shearrow's claim pursuant to 28 U.S.C. § 1337(a) because it arises from the same set of operative facts that give rise to Dawn Shearrow's claims, over which this court has federal question jurisdiction.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because all of the events or omissions giving rise to Plaintiffs' claims occurred within this district and because all defendants reside within this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.      On October 26, 2012, Dawn Shearrow filed a charge (EEOC Charge No. 440-2013-00300) with the Equal Employment Opportunity Commission alleging discrimination, harassment, and retaliation based on her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*

5.      On June 5, 2013, Dawn Shearrow filed a second charge (EEOC Charge No. 440-2013-03853) with the EEOC alleging, among other things, discrimination, harassment, retaliation, and failure to accommodate based on her disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*

6.      On April 10, 2014, the EEOC issued a notice and right to sue for Charge 440-2013-0300.  Counsel received that notice via regular mail on April 16, 2014.  A copy of the notice and right to sue is attached hereto as Exhibit A.

7.      On May 15, 2014, the United States Department of Justice issued a notice and right to sue for Charge 440-2013-3853.  Dawn Shearrow received that notice via certified mail on or about May 27, 2014.  A copy of the notice and right to sue is attached hereto as Exhibit B.

8.      This lawsuit has been filed within 90 days of receipt of both right to sue letters, thus satisfying the administrative prerequisites to filing suit under both the ADEA and the ADA.

2

## PARTIES

9.      Plaintiff Dawn Shearrow, born in 1967, is a citizen of the United States and a former employee of the Rockford Park District.  Dawn Shearrow demands a trial by jury on all of her claims.

10.     Plaintiff Del Shearrow is a citizen of the United States and, at all times relevant to the allegations of this complaint, has been married to and cohabitating with Dawn Shearrow.  Del Shearrow demands a trial by jury on his claim.

11.     Defendant Rockford Park District (the "Park District") is a municipal corporation organized under the Illinois Park District Code, 70 ILCS § 1205/1-1, *et seq.* Pursuant to the Park District Code, the Park District is governed by an elected, five-member Board of Commissioners (the "Board").

12.     At all times relevant to the allegations of this complaint, the Park District was an employer as defined by § 630(b) of the ADEA, § 12111(5)(A) of the ADA, and § 2611(4) of the Family and Medical Leave Act ("FMLA"), 28 U.S.C. 2601, *et seq.*

13.     On information and belief, at all times relevant to the allegations of this complaint, the Park District employed more than 501 employees for purposes of the limitations set forth in 42 U.S.C. § 1981a(b)(3)(D).

14.     Defendant Tim Dimke (yob – 1954) ("Dimke") is, and was at all times relevant to the allegations of this complaint, employed as the Executive Director of the Park District.   The Board has delegated final policy-making authority for all personnel matters relating to Park District employees to the Executive Director.  With regard to the allegations of this complaint, Dimke was, at all times, acting under color of state law by

3

virtue of his employment with the Park District and the authority delegated to him by the Board.

15.     Defendant Jessica Steinberg (yob – 1982) ("Steinberg") is, and was at all times relevant to the allegations of this complaint, an employee of the Park District. With regard to the allegations of this complaint, Steinberg was, at all times, acting under color of state law by virtue of her employment with the Park District, the authority delegated to her by the Executive Director, and her role as Dawn Shearrow's direct supervisor.

16.     Defendant Jay Sandine (yob – 1975) ("Sandine") is, and was at all times relevant to the allegations of this complaint, employed as Deputy Director of Operations for the Park District. With regard to the allegations of this complaint, Sandine was, at all times, acting under color of state law by virtue of his employment with the Park District and the authority delegated to him by the Executive Director.

17.     Defendant Zack McIntyre (yob – 1985) ("McIntyre") is, and was at all times relevant to the allegations of this complaint, an employee of the Park District. With regard to the allegations of this complaint, McIntyre was, at all times, acting under color of state law by virtue of his employment with the Park District, the authority delegated to him by the Executive Director, and his role as Dawn Shearrow's direct supervisor.

18.     Defendant Debbie Gass (yob – 1961) ("Gass") is, and was at all times relevant to the allegations of this complaint, employed as Deputy Director, Human Resources and Organizational Development for the Park District. Pursuant to the authority delegated to her by Dimke and subject to his discretionary review, Gass was charged with enforcement of the Park District's personnel policies. With regard to the

4

allegations of this complaint, Gass was, at all times, acting under color of state law by virtue of her employment with the Park District and the authority delegated to her by the Executive Director.

19.     Defendant Tyler Smith, ("Smith") is, and was at all times relevant to the allegations of this complaint, an elected Park District Commissioner.  With regard to the allegations of this complaint, Smith was, at all times, acting under color of state law by virtue of the powers granted to the Board by the Park District Code.

20.     Defendant Ian Linnabary, ("Linnabary") is, and was at all times relevant to the allegations of this complaint, an elected Park District Commissioner.  With regard to the allegations of this complaint, Linnabary was, at all times, acting under color of state law by virtue of the powers granted to the Board by the Park District Code.

21.     Defendant Douglas Brooks, ("Brooks") is, and was at all times relevant to the allegations of this complaint, an elected Park District Commissioner.  With regard to the allegations of this complaint, Brooks was, at all times, acting under color of state law by virtue of the powers granted to the Board by the Park District Code.

22.     Defendant Jack Armstrong, ("Armstrong") is, and was at all times relevant to the allegations of this complaint, an elected Park District Commissioner.  With regard to the allegations of this complaint, Armstrong was, at all times, acting under color of state law by virtue of the powers granted to the Board by the Park District Code.

23.     Defendant Nate Martin, ("Martin") was an elected Park District Commissioner in 2012.  With regard to the allegations of this complaint, Martin was, at

all times, acting under color of state law by virtue of the powers granted to the Board by the Park District Code.

## FACTS RELEVANT TO ALL OF MS. SHEARROW'S CLAIMS

### Ms. Shearrow's Employment History with the Park District 2005-2011

24.     In or about March 2005, Steinberg hired Dawn Shearrow to work in the Park District's ice facilities on a seasonal basis as an assistant to both Steinberg and Sandine. Less than a year later, Steinberg was transferred to Magic Waters, the Park District's water park, but Ms. Shearrow continued on as Sandine's assistant.

25.     In or about January 2007, Ms. Shearrow was transferred to Magic Waters to be its Group Sales Coordinator. This position was also seasonal until March 2007, when Karen Dylak and Sandine decided to hire Ms. Shearrow on a full-time basis.

26.     In Spring of 2008, Steinberg was appointed as Director of Magic Waters and became Ms. Shearrow's direct supervisor.

27.     In or about January 2009, Ms. Shearrow volunteered to take on the responsibilities of Business Operations Manager, a vacant position within Magic Waters, in addition to her existing duties as Group Sales Coordinator. In exchange for assuming the additional duties of Business Operations Manager, Steinberg told Ms. Shearrow that she would receive a pay raise and a full-time seasonal assistant.

28.     Although Ms. Shearrow believed that her new position and benefits had been approved by all necessary parties, Ms. Shearrow was given the title of Operations Manager, which is associated with a lower pay grade than Business Operations Manager.

29.     Although promised an assistant in early 2009 to help manage the increased work responsibilities she had acquired, Ms. Shearrow worked through Magic Waters' busiest season with no administrative help.  In fact, since that time, Ms. Shearrow was provided an assistant on two occasions, each for only a few months at a time.

30.     From the time she transitioned to full-time employment with the Park District until approximately March 2012, Ms. Shearrow compiled an uninterrupted string of performance reviews where she was rated "achieves expectations" or above.  In fact, of the seven evaluations she received between September 2007 and December 2011, Ms. Shearrow was rated as "exceeds expectations" or "outstanding" five times.

31.     Throughout her tenure as a full-time employee with the Park District, Ms. Shearrow, on her own initiative and without the prompting of management, proactively sought leadership roles, continuing education and development activities, and advancement opportunities.

32.     From the time she was hired until approximately March 2012, Ms. Shearrow had a very congenial working relationship with Steinberg.

**Facts Supporting a Pattern or Practice of Age Discrimination within the Park District**

33.     During her tenure as a full-time employee with the Park District, Ms. Shearrow observed numerous occasions where leadership, development, and educational opportunities were offered to younger employees solely on the initiative of the Park District's executive and managerial staff.

34.     In or about December 2009, Ms. Shearrow presented the credentials of two well-qualified candidates for open positions at Magic Waters to Steinberg for her

approval. Steinberg rejected the candidates, both of whom were over 40 years old, because they did not fit into the "youthful culture" of Magic Waters.

35. In or about May 2010, McIntyre, who was then approximately 26 years old and who had been trained as Ms. Shearrow's assistant for the previous several months, was hired into the senior position of Aquatics Operations Manager with a relative lack of experience.

36. In winter of 2010, Ms. Shearrow, with Steinberg's knowledge, applied for the position of Operations Manager for the Nicholas Conservatory and Gardens, a facility operated by the Park District. On information and belief, that position was filled by an applicant in his or her 20s.

37. In early 2012, Steinberg announced that she would be taking FMLA leave in June or July of that year because she was pregnant. On or about February 28, 2012, Ms. Shearrow learned that Steinberg and Sandine had decided to appoint McIntyre to take over Steinberg's job while she was on FMLA leave.

38. Upon realizing that she'd been passed over once again for an advancement opportunity in favor of a younger person, Ms. Shearrow began to realize that Steinberg and Sandine were strategically maneuvering younger, less-experienced employees into senior positions to the exclusion of more senior and experienced workers.

39. Steinberg and Sandine were effectuating these discriminatory employment decisions with either the express approval of Gass and Dimke or with reckless disregard for the disparate affect it was having on the Park District's older workers.

8

40.   The discriminatory employment decisions continued even after Ms. Shearrow made her claims known to several members of the executive management team and the Board.

**Ms. Shearrow's Reports of Discrimination and the Park District's Reaction**

41.   On or about March 2, 2012, Ms. Shearrow met with Sandine and advised him that she believed that there was a systemic scheme afoot that was unlawfully displacing older workers.  She also informed him that she believed she was the latest victim as she was being passed over for advancement opportunities in favor of younger, less-experienced candidates.

42.   During that meeting, Sandine ignored Ms. Shearrow's allegations of discrimination and claimed to be unaware of Ms. Shearrow's desire for advancement. He suggested that she speak with Steinberg to develop a plan to address her personal concerns.  On information and belief, Sandine did not report Ms. Shearrow's claims of widespread age discrimination to Gass or Dimke.

43.   On or about March 6, 2012, Ms. Shearrow met with Steinberg and voiced her concerns that there was a pattern of hiring and promoting only younger workers in the Aquatics Department and that she felt she was being unfairly passed over for advancement opportunities because of her age.

44.   Upon hearing Ms. Shearrow's complaints, Steinberg's first reaction was to suggest that Ms. Shearrow transfer to a different department and take a job that represented a comparative pay cut and less responsibility.

45.     In spite of Steinberg's reaction, Ms. Shearrow suggested that, upon her return from revenue school, the two of them should meet with ideas for a plan of action that would facilitate Ms. Shearrow's desire for advancement.  On information and belief, Steinberg never reported Ms. Shearrow's claims of age discrimination to Gass or Dimke.

46.     On or about March 19, 2012, Ms. Shearrow's first day back from revenue school, she met with Steinberg and inquired about the meeting to discuss a plan for career advancement.  Steinberg stated that she had not prepared anything and that there was no need to meet.  Instead, she provided Ms. Shearrow with a detailed list of tasks.

47.     Beginning around March 19, 2012 and continuing through early July 2012, Steinberg began to heavily scrutinize and unfairly criticize Ms. Shearrow's job performance.   Further, Steinberg also began to impede Ms. Shearrow's ability to effectively complete her work and would often assign Ms. Shearrow tasks with deadlines that were impossible to meet.

48.     Ms. Shearrow had never been subjected to this level of micromanagement nor had Steinberg ever treated her with such open hostility.  Nevertheless, Ms. Shearrow did her best to timely complete all assigned tasks.

49.     By late May 2012, Steinberg had made Ms. Shearrow's work environment unbearable.  During an unscheduled, closed-door meeting with Steinberg on May 24, 2012, Ms. Shearrow grew uncomfortable because of Steinberg's hostility, vocalized her feelings, and terminated the meeting so that she could discuss her growing concerns with human resources.

50.     Also on May 24, 2012, Ms. Shearrow, although visibly upset and still shaken from her encounter with Steinberg, met with Gass and Human Resources Generalist Sue Cichock to report her claims of systemic age discrimination and subsequent retaliation at the hands of Steinberg and Sandine.  Ms. Shearrow also reported that another Magic Waters employee, Terri Ekberg, had falsified her time cards.  Although Ms. Shearrow had reported the violation to Steinberg, Ekberg was not disciplined and instead was promoted to a salaried position.

51.     On May 25, 2012, when Ms. Shearrow met with Gass to provide documentation of her age discrimination claims, Gass informed her that she was being placed on paid administrative leave while her allegations were investigated.  Gass indicated that the reason placing her on leave was so that she would not be subject to a hostile environment.

52.     Steinberg was not placed on leave during the pendency of the investigation.

53.     Ms. Shearrow was instructed to report to work on June 15, 2012, at which time she met with Steinberg, Gass, and Sandine.  During that meeting Ms. Shearrow was informed that the investigation failed to substantiate her allegations of discrimination and that Steinberg and Sandine had grave concerns about her work performance.

54.     Despite the absence of any other written warnings, Steinberg and Sandine had prepared a "Final Warning" regarding the alleged deficiencies in Ms. Shearrow's performance and issued it to her during the June 15, 2012.

55.     For the next several days, Ms. Shearrow worked 11-14 hour days in her attempt to clear the backlog of work that had accrued during her involuntary leave while

also trying to accomplish the tasks enumerated in the June 15, 2012 "Final Warning." During that time, Steinberg canceled previously-scheduled meetings with Ms. Shearrow and would only communicate with her via email.

56.     Only 11 days after receiving the first "Final Warning," Ms. Shearrow was summoned to a meeting with Steinberg and Gass wherein she was issued a second "Final Warning."

57.     Upon receiving the June 26, 2012 Final Warning, Ms. Shearrow, already exhausted and anxiety-ridden due to the events of the previous 11 days, became nearly despondent and decided to appeal the "Final Warnings" to Dimke.

58.     Although Ms. Shearrow provided thorough rebuttals of the Final Warnings during her June 26, 2012 meeting with Dimke, he expressed no concern for her and instead told her that she must be perfect if she hoped to keep her job.

59.     Realizing that she had nowhere else to turn, on June 28, 2012, Ms. Shearrow sent a letter detailing the discrimination, harassment, and retaliation to which she had been subjected to the Board.  Instead of addressing any of those concerns, the Board simply referred the matter back to Dimke.

60.     Even after Ms. Shearrow's appeals to Dimke and the Board, Steinberg refused to relent.  Although officially on FMLA leave, Steinberg had contributed to a four-page document entitled "Failure of Continued Expectations" which was issued to Ms. Shearrow during a July 6, 2012 meeting with Gass, Sandine, and McIntyre.

61.     In addition to several other tasks she was required to complete, Ms. Shearrow was instructed to provide a written rebuttal with accompanying

documentation to each of the alleged failures enumerated in the July 6, 2012 letter no later than 5:00 p.m. that same day.  Ms. Shearrow timely submitted her rebuttal.

## Ms. Shearrow's Breakdown and First FMLA Leave

62.     On July 7, 2012, Ms. Shearrow reached a breaking point as a result of the discrimination, harassment, and retaliation to which she had been subjected since returning from involuntary leave.  The anxiety and stress led to a nervous breakdown that required Ms. Shearrow to be hospitalized.

63.     During her hospitalization, Ms. Shearrow, through her husband, requested FMLA leave to seek treatment for major depression, anxiety, insomnia, and other issues, all directly caused by the draconian working conditions to which Ms. Shearrow had been exposed since reporting the District's pervasive practices of discrimination.  The Park District granted her request for leave effective July 9, 2012 and continuing through September 1, 2012.

64.     While on FMLA leave, Ms. Shearrow received an undated letter from Dimke purporting to be a response to her appeal to the Board.  In his letter, Dimke expressed support for the actions of Ms. Shearrow's supervisors in their attempts to "make [her] aware of issues that have negatively impacted [the Park District's] customers and [her] fellow team members."

65.     On or about August 26, 2012, while still on FMLA leave, Ms. Shearrow provided a point-by-point response to Dimke's undated letter that also included additional discussion rebutting many allegations of poor work performance and requesting that, upon her return from leave, she be provided with same opportunities

and considerations as her peers.  In that letter, Ms. Shearrow also expressed interest in transferring to an equivalent position in a different department.

### Ms. Shearrow's Return to the Park District

66.     Prior to her return, Ms. Shearrow was instructed to report to HR for a meeting with Gass.  As an accommodation for her mental diagnoses, Ms. Shearrow requested that the meeting take place in a location besides HR, which was a trigger for her anxiety.  Knowing full well that Ms. Shearrow had exhausted her paid time off during FMLA leave, Gass declined the request and suggested that Ms. Shearrow could take sick days until she felt comfortable meeting in HR.

67.     On September 4, 2012, her first day back from FMLA leave, Ms. Shearrow met with Gass and Kari Feggestad, the Park District's Benefits Specialist, to discuss transitioning back into her job and to resolve any questions she may have about her leave of absence.  McIntyre, Ms. Shearrow's supervisor, was out of the office and provided no guidance to help her get back up to speed other than a list of "to dos" her immediate attention.

68.     After her meeting with Gass and Feggestad, Ms. Shearrow reported to Magic Waters and could immediately tell that everything was different.  Someone had turned her nameplate around and her colleagues, with whom she had previously had a warm relationship with, seemed distant and almost reluctant to initiate contact with her.

69.     On September 11, 2012, Ms. Shearrow met with Dimke and Gass to discuss the issues raised in Ms. Shearrow's August 26, 2012 letter.  Ms. Shearrow opened the discussion by telling her side of the story regarding having observed systemic

discrimination and Steinberg's and Sandine's campaign of retaliation against her and how it ultimately led to her breakdown and need to take FMLA leave. This was the first time Ms. Shearrow had been afforded to the opportunity to tell her side of the story verbally to Park District Executive Staff.

70.     During the meeting, Dimke told Ms. Shearrow that the last six months had been a waste of time and that if she wanted to keep her job, she would have to be perfect. He then offered Ms. Shearrow the opportunity to convene an independent panel to conduct a new investigation into Ms. Shearrow's claims, but if she chose that option, it could take weeks or months and would amount to more wasted time for the Park District.

71.     Alternatively, Dimke said that Ms. Shearrow could just figure out how to work with Steinberg upon her return because there were no other jobs for either of them. Based on his dismissive language and intimidating demeanor, Ms. Shearrow felt certain that choosing to convene an independent panel would likely yield more of the same caustic treatment that had precipitated her first breakdown.

72.     Ms. Shearrow again broached the subject of applying for other jobs within the Park District emphasizing that Steinberg's and Sandine's behavior led to her depression and anxiety. Despite Ms. Shearrow's substantiated rebuttals, Dimke was unyielding in that her negative human resources record would follow her to any internal application process.

73.     On or about September 20, 2012, Ms. Shearrow attended a meeting of all full-time Park District personnel. Dimke opened the meeting by stating that the Park

District did not need more lawsuits, and then he glared directly at Ms. Shearrow, humiliating her in front of her colleagues.

74.     Throughout September 2012, Ms. Shearrow experienced differential treatment by nearly everyone with whom she came in contact at work.  Unlike other employees returning from medical leaves of absence, Ms. Shearrow was not greeted warmly, but rather with indifference to her presence or thinly-veiled hostility at her reappearance.  After a meeting, Dimke approached Ms. Shearrow and positioned himself very close to her and conducted himself in a threatening manner causing her to feel intimidated and anxious.

75.     Ms. Shearrow began to feel despondent about her working conditions, which were rapidly deteriorating.  The same people and triggers that had led to her first breakdown were still part of her day-to-day routine.  She was blamed for destroying employee morale and, even though she continued to carry out her job duties effectively and professionally, she was again subjected to unfounded and hostile criticisms.

76.     On or about October 5, 2012, Ms. Shearrow learned of Dimke's plan for an "Organizational Alignment" that included the creation of new Park District positions and the transfer of existing employees to new areas.  Less than a month prior he had denied her request for a transfer as an accommodation for her disability saying that there were no positions available.

77.     In addition to several other personnel changes in connection with the reorganization, Ms. Shearrow noted that her former trainee, Martesha Brown, was being promoted to the Marketing Team.

16

78.     On or about October 11, 2012, Ms. Shearrow attended an Operations Planning Meeting but, having been on both administrative and FMLA leave and locked out of her email during those times, she had missed the busiest season at Magic Waters and was largely unaware of the developments that occurred during her absence. For this reason, she had little to add during the meeting. Nevertheless, McIntyre found her lack of participation troubling and harshly criticized her for it. He also reiterated that she had ruined employee morale at Magic Waters.

79.     The cumulative effect of these incidents was simply too much for Ms. Shearrow, who was still recovering from the first breakdown caused by her employers. Utter hopelessness and despondency overcame her and, on October 18, 2012, Ms. Shearrow attempted to take her own life. Mr. Shearrow was able to get her to the ER in time, but the damage had been done and Ms. Shearrow was again placed on FMLA leave.

80.     Ms. Shearrow's FMLA leave ran out on or about November 15, 2012 and the Park District placed her on personal leave. Eventually, on or about February 13, 2013, shortly after an unsuccessful mediation of her first EEOC Charge, the Park District elected to terminate Ms. Shearrow's employment.

## COUNT I – Age Discrimination v. Rockford Park District

81.     Ms. Shearrow incorporates and realleges paragraphs 1 – 80 as if fully set forth herein.

82.     Despite having always met or exceeded her employer's expectations, Ms. Shearrow, who is over 40 years of age, was passed over for promotions to positions for

which she was qualified, leadership opportunities, and educational development opportunities that were given to substantially younger employees.

83.     The loss of development and advancement opportunities because of Ms. Shearrow's age resulted in pecuniary loss in the form of a lower base salary.

84.     Each time she was subjected to disparate treatment because of her age, the more favorably treated employees were less qualified and less experienced than she was.

85.     The acts of discrimination are attributable to the Park District and were willful or were taken with reckless disregard for Ms. Shearrow's rights.

WHEREFORE, Dawn Shearrow prays that this Honorable Court enter judgment in her favor pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* and an order awarding her:

A.     Actual damages in the form of back pay for lost wages and benefits, front pay, liquidated damages as authorized by the ADEA, pre- and post-judgment interest, and any other financial compensation permitted by the ADEA to make her whole;

B.     Award her attorney's fees and costs; and

C.     Any and all such other relief as this Court deems equitable and just.

### COUNT II – Retaliation in violation of the ADEA v. Rockford Park District

86.     Ms. Shearrow incorporates and realleges paragraphs 1 – 80 as if fully set forth herein.

87.     Ms. Shearrow's reports of age discrimination triggered an immediate and hostile response from her supervisors in the form of unfounded criticism, workplace

humiliation, changed and more difficult or impossible work assignments, and other materially adverse actions.

88.     The acts of retaliation to which Ms. Shearrow was subjected are attributable to the Park District and were done willfully or with reckless disregard for her rights.

WHEREFORE, Dawn Shearrow prays that this Honorable Court enter judgment in her favor pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* and an order awarding her:

A.     Actual damages in the form of back pay for lost wages and benefits, front pay, liquidated damages as authorized by the ADEA, pre- and post-judgment interest, and any other financial compensation permitted by the ADEA to make her whole;

B.     Award her attorney's fees and costs; and

C.     Any and all such other relief as this Court deems equitable and just.

### COUNT III – Disability Discrimination v. Rockford Park District

89.     Ms. Shearrow incorporates and realleges paragraphs 1 – 80 as if fully set forth herein.

90.     In July 2012, Ms. Shearrow was diagnosed with major depression, anxiety and insomnia.  Ms. Shearrow's supervisors were aware of these diagnoses because she was granted FMLA leave to seek treatment.

91.     These diagnoses are disabilities within the meaning of the ADA because they substantially limit Ms. Shearrow's ability to sleep, concentrate, care for herself, and work, among other things.

92.     Despite these limitations, Ms. Shearrow remained a qualified individual in that she was able to perform all functions of her job with a reasonable accommodation.

93.     Even though they were fully aware of Ms. Shearrow's disabilities, her supervisors nevertheless took discriminatory and adverse actions against her including: failing or refusing to promote or transfer her, assigning her impossible tasks, berating and humiliating her in front of her peers, and terminating her employment.

94.     As a result of these actions, Ms. Shearrow experienced a drastic relapse in her depression and anxiety and ultimately tried to take her own life.  She was unable to work subsequent to the suicide attempt because she was hospitalized.  She has since been diagnosed with post-traumatic stress disorder and continues to suffer from the residual effects of the treatment of her employer.

95.     Ms. Shearrow's supervisors were either motivated by or took these actions because of her disabilities in violation of the ADA and such actions are attributable to the Park District.

WHEREFORE, Dawn Shearrow prays that this Honorable Court enter judgment in her favor pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. and an order awarding her:

A.     Actual damages in the form of back pay for lost wages and benefits, front pay, pre- and post-judgment interest;

B.     compensatory damages of $300,000 for pain and suffering and other emotional distress;

C.     Award her attorney's fees and costs; and

D.      Any and all such other relief as this Court deems equitable and just.

## COUNT IV – Failure to Accommodate v. Rockford Park District

96.      Ms. Shearrow incorporates and realleges paragraphs 1 – 80 and 90 - 92 as if fully set forth herein.

97.      On several occasions after returning to work having been diagnosed with major depression and anxiety, Ms. Shearrow asked her employer for accommodations for these disabilities.  Specifically, she requested that meetings with HR staff be held in a location that was less likely to trigger her anxiety and she requested transfers to other positions with different supervisors because Steinberg, Sandine, and McIntyre were also triggers for her anxiety.

98.      Not only were each of her requests for accommodation denied, but Dimke and Gass flatly refused to engage in the interactive process required by the ADA.

99.      As a result of these actions, Ms. Shearrow experienced a drastic relapse in her depression and anxiety and ultimately tried to take her own life.  She was unable to work subsequent to the suicide attempt because she was hospitalized.  She has since been diagnosed with post-traumatic stress disorder and continues to suffer from the residual effects of the treatment of her employer.

100.     The actions of Gass and Dimke were willful or made with reckless disregard for Ms. Shearrow's rights and are attributable to the Park District.

WHEREFORE, Dawn Shearrow prays that this Honorable Court enter judgment in her favor pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. and an order awarding her:

A.      Actual damages in the form of back pay for lost wages and benefits, front pay, pre- and post-judgment interest;

B.      compensatory damages of $300,000 for pain and suffering and other emotional distress;

C.      Award her attorney's fees and costs; and

D.      Any and all such other relief as this Court deems equitable and just.

## COUNT V – FMLA Retaliation v. Rockford Park District

101.    Ms. Shearrow incorporates and realleges paragraphs 1 – 80 as if fully set forth herein.

102.    Ms. Shearrow's return from FMLA leave in September 2012 was accompanied by an immediate response from her supervisors in the form of unfounded criticism, workplace humiliation, changed and more difficult or impossible work assignments, and other materially adverse actions.

103.    As a result of these actions, Ms. Shearrow experienced a drastic relapse in her depression and anxiety and ultimately tried to take her own life.  She was unable to work subsequent to the suicide attempt because she was hospitalized.  She has since been diagnosed with post-traumatic stress disorder and continues to suffer from the residual effects of the treatment of her employer.

104.    The acts of retaliation to which Ms. Shearrow was subjected were done willfully or with reckless disregard for her rights and are attributable to the Park District because they were perpetrated by her supervisors.

WHEREFORE, Dawn Shearrow prays that this Honorable Court enter judgment in her favor pursuant to the Family and Medical Leave Act, 28 U.S.C. 2601, *et seq*. and an order awarding her:

A.     Actual damages in the form of back pay for lost wages and benefits, liquidated damages as authorized by the FMLA, pre- and post-judgment interest, and any other financial compensation permitted by the FMLA to make her whole;

B.     Award her attorney's fees and costs; and

C.     Any and all such other relief as this Court deems equitable and just.

**COUNT VI – Age Discrimination 42 U.S.C. § 1983 v. All Defendants**

105.     Ms. Shearrow incorporates and realleges paragraphs 1 – 84 as if fully set forth herein.

106.     As a result of these actions, Ms. Shearrow experienced a drastic relapse in her depression and anxiety and ultimately tried to take her own life.  She was unable to work subsequent to the suicide attempt because she was hospitalized.  She has since been diagnosed with post-traumatic stress disorder and continues to suffer from the residual effects of the treatment of her employer.

107.     The age discrimination experienced by Ms. Shearrow is a violation of the Equal Protection Clause of the 14th Amendment of the U.S. Constitution.  The right to be free from this type of discrimination is clearly established. This action to redress unconstitutional discrimination is brought pursuant to 42 U.S.C. § 1983.

108.    Dimke's participation in this discrimination and his approval of the discriminatory actions of others raises it to the level of a custom of policy attributable to the Park District.

109.    Despite having appealed to the Board for relief from discrimination, the commissioners ignored Ms. Shearrow's plight in reckless disregard for the ongoing violation of her constitutional rights.

WHEREFORE, Dawn Shearrow requests this Honorable Court enter judgment in her favor and an order:

A.    Awarding her all monetary damages available under the law including back pay, front pay, pre- and post-judgment interest, compensatory damages for emotional distress and pain and suffering against all defendants jointly and severally;

B.    An award for punitive damages in excess of $500,000 against all individual defendants jointly and severally;

D.    Award her attorney's fees and costs; and

E.    Any and all such other relief as this Court deems equitable and just.

**COUNT VII – Retaliation for Reporting Age Discrimination v. All Defendants**

110.    Ms. Shearrow incorporates and realleges paragraphs 1 – 80, and 87 – 88 as if fully set forth herein.

111.    The retaliation experienced by Ms. Shearrow is a form of age discrimination and is a violation of the Equal Protection Clause of the 14th Amendment of the U.S. Constitution.  The right to be free from this type of discrimination is clearly established.

This action to redress unconstitutional discrimination is brought pursuant to 42 U.S.C. § 1983.

112.     Dimke's participation in this discrimination and his approval of the discriminatory actions of others raises it to the level of a custom of policy attributable to the Park District.

113.     Despite having appealed to the Board for relief from discrimination, the commissioners ignored Ms. Shearrow's plight in reckless disregard for the ongoing violation of her constitutional rights.

WHEREFORE, Dawn Shearrow requests this Honorable Court enter judgment in her favor and an order:

A.     Awarding her all monetary damages available under the law including back pay, front pay, pre- and post-judgment interest, compensatory damages for emotional distress and pain and suffering against all defendants jointly and severally;

B.     An award for punitive damages in excess of $500,000 against all individual defendants jointly and severally;

D.     Award her attorney's fees and costs; and

E.     Any and all such other relief as this Court deems equitable and just.

**COUNT VIII – First Amendment Retaliation, 42 U.S.C. § 1983 v. All Defendants**

114.     Ms. Shearrow incorporates and realleges paragraphs 1 – 80 as if fully set forth herein.

115.     Ms. Shearrow's complaints of discrimination are speech of public concern because they were about the actions of a public employer funded by tax-payer dollars

and because they alleged a systemic culture of discrimination at the Park District that affected many people, not just her.

115.    Ms. Shearrow's complaints and appeals were not made pursuant to her job duties, but rather she was speaking out as concerned citizen.

116.    As a result of the retaliatory actions taken by Steinberg, McIntyre, Dimke, Sandine, and Gass, Ms. Shearrow experienced a drastic relapse in her depression and anxiety and ultimately tried to take her own life. She was unable to work subsequent to the suicide attempt because she was hospitalized. She has since been diagnosed with post-traumatic stress disorder and continues to suffer from the residual effects of the treatment of her employer.

117.    Dimke's participation in this discrimination and his approval of the discriminatory actions of others raises it to the level of a custom of policy attributable to the Park District.

118.    Despite having appealed to the Board for relief from discrimination, the commissioners ignored Ms. Shearrow's plight in reckless disregard for the ongoing violation of her constitutional rights.

WHEREFORE, Dawn Shearrow requests this Honorable Court enter judgment in her favor and an order:

A.    Awarding her all monetary damages available under the law including back pay, front pay, pre- and post-judgment interest, compensatory damages for emotional distress and pain and suffering against all defendants jointly and severally;

B.      An award for punitive damages in excess of $500,000 against all individual defendants jointly and severally;

D.      Award her attorney's fees and costs; and

E.      Any and all such other relief as this Court deems equitable and just.

### COUNT IX – Loss of Consortium v. Individual Defendants

119.    Mr. Shearrow incorporates and realleges paragraphs 1 – 80 as if fully set forth herein.

120.    Ms. Shearrow's breakdown and diagnoses in July 2012 led to a substantial deterioration in the physical and emotional relationship she had with her husband.

121.    After his wife's breakdown, Mr. Shearrow had to care for her and experienced a grave loss of his wife's companionship.  This loss taxed him emotionally and physically leading to a general deterioration of his health as well.

122.    These losses experienced by Mr. Shearrow are directly attributable to the intentional acts of Dimke, Gass, Steinberg, Sandine, and McIntyre and the negligence of the remaining individual defendants.

WHEREFORE, Del Shearrow respectfully requests this Court enter judgment in his favor and order:

A.      awarding compensatory damages jointly and severally against all individual defendants;

B.      awarding punitive damages in excess of $100,000 jointly and severally against Dimke, Gass, Steinberg, Sandine, and McIntyre; and

C.      such other legal and equitable relief as this Court deems just.

Dated:  July 11, 2014

Respectfully submitted:

Dawn Shearrow and Del Shearrow

By:___/s/ Bradford A. LeHew_____
         Their Attorney

Bradford A. LeHew (ARDC No. 6280452)
Law Offices of Bradford LeHew
401 South LaSalle Street, Suite 800-I
Chicago, Illinois 60605
312-945-6621
312-660-8803 (fax)